UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LARRY DICKERSON, ) | |
| ) | |
| Petitioner, ) | NO. 3:07-00855 |
| ) | JUDGE HAYNES |
| v. ) | |
| ) | |
| JAMES FORTNER, ) | |
| ) | |
| Respondent. ) | |

## M E M O R A N D U M

Petitioner, Larry Dickerson, filed this pro se action under 28 U.S.C. §§ 2201, 2241 and 2254 seeking the writ of habeas corpus to set aside his conviction of first-degree murder for which he received a life sentence. After a review of the petition, the Court appointed the Federal Public Defender, and in his amended petition, Petitioner's claims are: (1) that his trial counsel provided ineffective assistance due to the failure to pursue defenses and failure to present testimony of a psychiatrist; (2) that his appellate counsel on direct appeal failed to present his suppression of evidence claim; and (3) that the State's prosecutor made a prejudicial closing argument.

### A. Procedural History

On February 9, 2000, a jury found Petitioner guilty of first-degree murder, for which Petitioner received a life sentence. State v. Dickerson, 2001 WL 1042128, at *1 (Tenn. Ct. Crim. App. Sept. 10, 2001). On his direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's conviction and sentence. On February 11, 2002, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id.

1

On September 27, 2002, Petitioner filed a state post-conviction petition with several claims of ineffective assistance of counsel. The state trial court denied relief and on appeal, the Tennessee Court of Criminal Appeals affirmed. Dickerson v. State, 2006 WL 3327824 (Tenn. Ct. Crim. App. Nov. 15, 2006). On March 19, 2007, the Tennessee Supreme Court denied Petitioner's application for permission to appeal.

### B. Review of State Record

In his direct appeal, the Tennessee Court of Criminal Appeals made the following findings of fact.[1]

> The defendant and the victim were married for 27 years and worked in the same factory. In August 1997, the victim moved out of their home and eventually filed for divorce. Witnesses familiar with the defendant testified the defendant's behavior changed dramatically after the separation. The defendant stalked the victim from the time of their separation until the victim's death. He interfered with her work by frequenting her work area. When he was barred from her work area, the defendant began hiding in the ventilation system of the plant where he could watch her through a vent. Outside of work, the defendant repeatedly followed the victim. He borrowed a friend's truck in order to spy on her. On one occasion, he hid in her vehicle while carrying a pellet pistol in order to frighten her. The defendant wrote numerous letters and notes to the victim during their separation.
>
> In October 1997, the defendant purchased the rifle he used to kill the victim, which was the first firearm he had ever purchased. Just a few hours prior to the killing, the defendant telephoned his son-in-law and asked where he could purchase ammunition for the rifle.
>
> Larry Dean Dickerson, the defendant, shot and killed his estranged wife during the early morning hours of December 20, 1997. Ellen Nunnery, a friend of the victim, testified she had given the victim a ride home. After the victim exited the vehicle, she stooped to speak to Nunnery through the window of the vehicle. Nunnery heard a shot, and the window shattered. A second shot rang out, and the victim collapsed beside the car. The medical examiner testified the victim had been shot twice, once on the left forearm and again in the chest, with the cause of death being the wound to the chest.

---

[1] State appellate court opinion findings can constitute factual findings in a habeas action. Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness. 28 U.S.C. § 2254(e).

2

The defendant admitted to law enforcement that he shot the victim. He said he parked his car, took his rifle, and walked approximately 200 yards to a hiding place in the bushes across the street from the victim's home. For an hour, he waited in the bushes for the victim to return home. He admitted firing two shots. After shooting the victim, the defendant disposed of the weapon and traveled to several different locations, including Jackson, Memphis, Missouri, and Illinois before returning to his home, where he was arrested several days after the killing.

The prosecution and the defense each presented expert testimony regarding the defendant's capacity to commit a premeditated murder. Dr. Nat Winston, a psychiatrist, testified on behalf of the state that, in his opinion, the defendant had the ability to premeditate the killing. The defendant's expert witness, psychologist Dr. John McCoy, stated the defendant suffered from obsessive compulsive disorder at the time of the offense. He opined the defendant was not capable of premeditation due to the disorder.

The jury convicted the defendant of premeditated first degree murder, and he received a life sentence with the possibility of parole.

State v. Dickerson, 2001 WL 1042128, at *1-2. The state appellate courts' other findings are set forth in the context of Petitioner's specific claims.

### C. Conclusions of Law

This claim is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a

3

conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court conviction became final." Id. at 390; accord Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

### 1. Ineffective Assistance of Counsel

Petitioner's ineffective-assistance claims are that his trial counsel was ineffective for failing to investigate and develop a defense based upon Petitioner's taking of Zoloft at the time of the shooting, and for failing to present testimony of a psychiatrist at trial. Petitioner also asserts that his appellate counsel failed to raise the suppression issue that was preserved for an

appeal. As described by the Tennessee appellate court, Petitioner's claims in the state court were as follows:

> The petitioner argues that his trial counsel was ineffective by failing to: (1) advise the petitioner of his court dates, visit him regularly in jail, or convey the state's offer to him; (2) discuss the investigation of the case and witness interviews with him; (3) discuss trial strategy, other than attempting to negate intent, and reviewing discovery with him; (4) pursue his use of Zoloft and codeine as a possible defense; (5) raise at trial the issue of the taped conversation between him and Agent Jolley; and (6) call Dr. Daniels, a psychiatrist, in his defense.
>
> The petitioner contends that trial counsel "failed to establish a proper working relationship" with him because counsel failed to inform him of court dates, visit him regularly in jail, or convey a plea offer to him.

Dickerson v. State, 2006 WL 3327824, at *5. In a word, Petitioner did not present his claim about his appellate counsel.

In Petitioner's state post-conviction appeal, the Tennessee Court of Criminal Appeals found as follows on these claims:

> At the post-conviction hearing, the petitioner testified that he signed an attorney-client fee contract with his trial counsel that included a provision for a thirty-day notice before the attorney removed himself from the case and a provision for counsel to represent the petitioner up to the appeals level at the state supreme court. The petitioner said counsel did not tell him about pre-trial court dates or about any of the investigation being done for his case. He said that counsel did not discuss the state's evidence with him and that he did not see some crucial pieces of the state's evidence, such as a Tennessee Bureau of Investigation (TBI) report and some photographs, until the trial. He said that trial counsel never communicated a plea offer to him and that counsel told him, "They don't want nothing. We're going all the way."
>
> The petitioner testified that counsel discussed with him his obsessive-compulsive disorder and Dr. McCoy's evaluation of him and testimony. He said counsel rested the entire case on the petitioner's obsessive-compulsive disorder and discussed no other possible defense or strategy with him. He said that at the time of the killing he was taking two medications, Zoloft and codeine. The petitioner felt that counsel should have considered the effects of the medications and their interaction in his defense. He also said a gap of fifteen or sixteen minutes was in his taped interview with TBI Agent David Jolley that was played at trial. He said that during this edited period, he discussed the medications that he took. He said that he informed counsel about this but that counsel did not raise the issue at trial.

5

The petitioner also felt that counsel should have subpoenaed some people from Baptist Hospital, where he received psychological treatment, in order to show the stress he was under leading to the homicide.

On cross-examination, the petitioner testified that the only person hired by his trial counsel with whom he spoke was Dr. McCoy, but he later acknowledged that he had a meeting lasting approximately thirty minutes with a psychiatrist, Dr. William Daniels. The petitioner also acknowledged that he discussed with counsel ten specific witnesses whom he wanted counsel to interview. He said, though, that he never heard anything else from counsel about some of those witnesses and that he was only told that others would not testify. He said he talked to counsel about his stay at Baptist Hospital and that he looked at some of the records counsel had obtained from there. He said that he wrote to counsel numerous times while in jail and that counsel had responded a "couple of times." The petitioner said he had given a confession to Agent Jolley and acknowledged that his counsel filed an unsuccessful motion to suppress the confession. He also acknowledged that he had no alibi defense and that the defense strategy was to prove that he did not have the mental capacity to form the premeditation required for first degree murder.

The petitioner's trial counsel testified that he withdrew from the petitioner's case around the same time that he filed the notice to appeal. Counsel testified that he remembered filing two motions to suppress in the petitioner's case, although the record showed that he had filed three. He said he remembered talking to the petitioner about potential witnesses, and his file included four pages of hand-written notes summarizing interviews that either he or his paralegal had with ten different witnesses. He said he did not remember conversations about specific witnesses other than Dr. McCoy and Dr. Daniels. He said he discussed with the petitioner two of the state's witnesses, Agent Jolley and Dr. Nat Winston.

Counsel read a letter written by Dr. Daniels, which stated that, in his opinion, if the petitioner had received appropriate treatment, the homicide probably could have been avoided. Counsel acknowledged that Dr. Daniels, who was not called to testify at trial, was a psychiatrist, whereas Dr. McCoy, who did testify for the petitioner at trial, was a psychologist. Dr. Winston, the state's expert witness at trial, was a psychiatrist with several years' experience. Counsel testified that his trial strategy was to prove that the petitioner was not capable of forming premeditation for first degree murder. He said that while Dr. Daniels agreed with Dr. McCoy's evaluation "[t]o a certain extent," Dr. Daniels would have testified that the petitioner "may or may not have had the ability to form premeditation." Counsel acknowledged that he did not attempt to find another psychiatrist who would have testified favorably for the petitioner. He said he did talk to Dr. Daniels and Dr. McCoy about the effects of the petitioner's obsessive-compulsive disorder on his confession and whether they could help in having the confession suppressed. He said neither doctor could assist with that issue.

6

Counsel testified that although he could not remember specific interviews with the state's witnesses, he knew that he had pretrial discussions with every witness who testified at trial. He said he did not object to Dr. Winston being declared an expert based on not having any publications because he did not believe that alone warranted an objection. He said he did not question Dr. Winston extensively on the methods used to evaluate the petitioner because he thought it would be foolish to do so. He said his strategy was to attack Dr. Winston's ultimate conclusion that the petitioner could have formed premeditation by pointing out that the psychiatrist had not used the legal definition of premeditation in forming his conclusion.

On cross-examination, counsel testified that he began practicing law in 1983 and that he was involved in about 100 criminal jury trials and about a dozen first degree murder trials. He said that he had the petitioner sign a contract that said he would only represent the petitioner at the trial level. He said that when he was first retained, he talked with the petitioner about the petitioner's version of what happened and the facts surrounding the homicide and the petitioner's confession. Counsel said he got the impression that the petitioner's wife's leaving him in the same weekend that his daughter got married and moved away had a dramatic effect on the petitioner. He said he interviewed several people who confirmed this theory. He said the purposes of the psychological evaluations were to determine whether the petitioner was competent to stand trial, whether an insanity defense could be supported, whether the petitioner could have formed the requisite premeditation for first degree murder, and whether the petitioner could have had a "knowing" mental state for second degree murder. He said both Dr. Daniels and Dr. McCoy opined that the petitioner was competent to stand trial and was not legally insane at the time of the killing. Counsel's strategy was then to negate the premeditation element of first degree murder and have the petitioner convicted of a lesser offense. He said that he discussed this strategy and the potential sentences for different offenses with the petitioner and that the petitioner appeared to understand.

Counsel testified that he did discuss a plea offer with the petitioner and the petitioner's brother. He said both rejected the forty-year offer for second degree murder because they felt that a forty-year sentence, to be served at 100%, would amount to the petitioner spending the rest of his life in prison. He said he conveyed the plea offer to the petitioner the last time he spoke to him before trial, which was one or two days before trial.

The trial court dismissed the petition for post-conviction relief, finding:

There was no proof presented at the post conviction relief hearing as to anything more that defense counsel could have done to convince a jury that the Petitioner's confession was untrue or that his mental state was such that he could not premeditate and deliberate. It was just impossible to save the Petitioner from a verdict of guilty of murder in the first degree. The advice given and the services

rendered by [defense counsel] were clearly within the range of competence demanded of attorneys in criminal cases in Tennessee or elsewhere.

The petitioner appeals the trial court's dismissal of his petition and argues that he received the ineffective assistance of counsel.

Dickerson v. State, 2006 WL 3327824, at **2, 3, 4.

As to its disposition of Petitioner's claims based upon its factual findings, the Tennessee appellate court ruled and reasoned as follows:

> . . . The petitioner's testimony that counsel failed to visit him or convey a plea offer was contradicted by counsel's testimony that he met with the petitioner on several occasions, sometimes met with the petitioner and the petitioner's brother, and relayed to the petitioner and his brother a plea offer from the state that they rejected. **The only evidence that counsel did not inform the petitioner of court dates was the petitioner's testimony that he was unaware of a pretrial date. The petitioner did not explain how he was prejudiced by counsel's alleged failure. The trial court accredited the testimony of counsel, and nothing in the record preponderates against the finding that counsel did not fail to establish a proper working relationship with the petitioner. This issue is without merit.**
>
> ### II.
> The petitioner contends that trial counsel was ineffective in failing to discuss with him the investigation of the case and interviews with potential witnesses. At the post-conviction hearing, four pages of hand-written notes from counsel's interviews with potential witnesses were introduced into evidence. These notes indicated that counsel had discussed potential witnesses with the petitioner and had investigated whether those witnesses could benefit the defense. Counsel's notes reflected that the majority of those witnesses could be of no use to the defense. The petitioner acknowledged that counsel interviewed these witnesses but complained that counsel did not discuss the interviews with him, although he admitted that counsel told him that some of the witnesses would not testify at trial. The petitioner has failed to show how the alleged failure of counsel to have more in-depth discussions with him regarding witness interviews and investigation prejudiced him. On appeal, the petitioner argues that he "could not make intelligent choices regarding the defense and decision to go to trial as opposed to trying to work out a plea bargain." **At the post-conviction hearing, however, the petitioner did not testify that he would have insisted on arranging a plea bargain if he had been better informed about the status of potential witnesses. In fact, the petitioner claimed that no plea offer was relayed to him. We conclude that the petitioner has not established that he was prejudiced by not receiving more information from counsel on the investigation of the case and interviews with witnesses. The petitioner is not entitled to relief on this issue.**

8

### III.

The petitioner contends that trial counsel failed to discuss trial strategy or discovery with him adequately. **Counsel testified, and the petitioner acknowledged, that his trial strategy was to negate the petitioner's ability to form the mental state required for first degree murder and that he discussed this strategy with the petitioner. The petitioner is apparently unsatisfied that counsel did not discuss other possible strategies with him. Evidence at the post-conviction hearing showed that the petitioner had no alibi defense and that the state had proof, including the petitioner's own confession, identifying the petitioner as the person who killed his wife. Counsel testified that focusing on the petitioner's obsessive-compulsive disorder and mental state after his wife left him in order to negate premeditation was the best defense available to the petitioner. Counsel developed this strategy after employing the services of two mental health professionals and interviewing several witnesses. Moreover, counsel testified that he and the petitioner discussed the petitioner's view of what happened the night the petitioner's wife was killed. Counsel's defense strategy was informed and based on adequate preparation. Counsel was not deficient in focusing primarily on this strategy.**

**Petitioner also contends that counsel was ineffective in failing to discuss with him the TBI report used at trial. The petitioner provides no argument as to how counsel was deficient in this regard and how he was prejudiced by this. There is no merit to this contention.**

### IV.

The petitioner contends that counsel was ineffective for failing to investigate the petitioner's prescription drug use as a possible defense to murder. **The petitioner testified that at the time he shot his wife, he was taking both Zoloft and codeine. He said counsel failed to consider the interaction of these medications and how they affected his obsessive-compulsive disorder. However, aside from saying he felt that counsel should have "considered" this, he offered no evidence that a further investigation into the effects of his medications would have provided him with an effective defense. In short, the petitioner failed to show that he was prejudiced by this alleged failure. This issue is without merit.**

### V.

The petitioner faults trial counsel for not making an issue of the fifteen-minute gap in the taped interview between him and TBI Agent Jolley. The petitioner testified that during this edited portion, he discussed with Agent Jolley the medications he was taking. **The petitioner acknowledged, however, that counsel attempted, unsuccessfully, to have his statements to Agent Jolley suppressed. Moreover, the petitioner did not show how raising the issue of the edited portion of the tape hurt his defense; he only states in his argument that mentioning the gap in the tape could have made the jury "very**

9

> suspicious as to the accuracy" of the taped statements. The petitioner has not established that he was prejudiced, and this issue is without merit.
>
> ### VI.
> Finally, the petitioner argues that trial counsel was ineffective in failing to call Dr. Daniels to testify at trial. **Counsel testified that he employed both Dr. Daniels, a psychiatrist, and Dr. McCoy, a psychologist, to evaluate the petitioner and make conclusions as to the petitioner's mental state. Counsel hoped that the doctors could substantiate the defense that the petitioner was unable to form the premeditation required for first degree murder. Counsel said that he discussed the results of the evaluation with Dr. Daniels and that Dr. Daniels was unable to say whether the petitioner could have formed premeditation at the time of the killing. Thus, counsel chose to call Dr. McCoy, who did testify that the petitioner was unable to form premeditation. The petitioner contends that not calling Dr. Daniels prejudiced him in that the state's expert witness was a psychiatrist, whereas his expert witness was a psychologist.**
>
> **We conclude that counsel was not deficient in not calling Dr. Daniels to testify. Counsel had sound tactical reasons for calling Dr. McCoy and not Dr. Daniels. Furthermore, the petitioner has not shown how Dr. Daniels could have supported his defense.** If a petitioner faults trial counsel for failing to call a known witness, he must prove prejudice by showing that the witness had critical evidence that was not used. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). **The letter written by Dr. Daniels and introduced into evidence by the petitioner stated only that had the petitioner "received appropriate treatment for his mental disorder, in all likelihood the homicide of Belinda Dickerson probably could have been avoided." It does not address the issue of whether the petitioner could have formed premeditation, which was the issue about which counsel was most concerned. Counsel was not ineffective in failing to call Dr. Daniels at trial.**

Id. at 5, 6, 7 (emphasis added).

In Mitchell v. Mason, 325 F.3d 732, 739 (6th Cir. 2003) the Sixth Circuit identified two broad categories of ineffective assistance of counsel claims in Supreme Court precedents: (1) the actual or effective absence of counsel at the critical stage of the proceeding for which presumed prejudice arises; and (2) counsel whose performance was deficient on specific issues and was demonstrably prejudicial to the defendant. As that Court explained:

> In United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), ... the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant

> when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." In Williams, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." Williams, 529 U.S. at 391 . . . (citing Strickland, 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. Olden, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial).

Id. at 740.

> Within the first category are three types of presumptive ineffectiveness of counsel:
>
> The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to subject the prosecutions' case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 742.

Here, from the review of the state court record, the Court concludes that Petitioner's ineffective assistance of counsel claims fall within the Strickland standard. As discussed infra, with the Tennessee courts' findings, this Court concludes that the Cronic standard does not apply here.

Under Strickland, to prevail on these claims of ineffective assistance, Petitioner must demonstrate that, under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. 466 U.S. at 695. As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.

> Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, **strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.**
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. **Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.** For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And **when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.** In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91 (emphasis added). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005).

12

Petitioner asserts that ineffective assistance occurs when trial counsel on a first degree murder charge fails to investigate fully a diminished-capacity defense to the mens rea element, citing Jacobs v. Horn, 395 F.3d 92, 103-06 (3d Cir. 2005) ("Counsel did not exercise reasonable professional judgment in failing to investigate further and discover evidence") and Jennings v. Woodford, 290 F.3d 1006 (9th Cir. 2002) (ineffective and prejudicial assistance rendered for only obtaining a psychiatrist evaluation for two hours).

Here, Petitioner's trial counsel obtained two experts, a psychiatrist and psychologist. Petitioner's trial counsel selected the psychologist as the expert who could testify favorably on the issue of Petitioner's premeditation. With two experts' assessments, Petitioner's trial counsel was able to make an informed tactical decision. Under Tennessee law, the expert would have to opine that Petitioner's mental condition precluded Petitioner from acting "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (1997). Dr. Daniels, the psychiatrist, could not opine on premeditation and would only state that the absence of effective prior mental health treatment could have avoided the murder. In addition, Dr. Daniels's opinion was that Petitioner may have been able to premeditate and that testimony would have been consistent with the State's expert's opinion. Petitioner's use of drugs at the time of the murder was before the jury that was charged on the State's requirement to prove petitioner's intent and premeditation. The evidence of Petitioner's acts prior to and after the murder is consistent with premeditation. Petitioner's claims about his trial counsel lack merit.

As to Petitioner's appellate counsel's failure to raise the suppression issue on appeal, such an omission may constitute ineffective assistance of counsel. Kimmelman v. Morrison, 477 U.S. 365, 385 (1986), but in Murray v. Carrier, 477 U.S. 478, 487 (1986), the Supreme Court made it clear that ignorance or the inadvertence of counsel or counsel's deliberate appellate

strategy that fails to raise a "particular claim" would preclude federal habeas review of a claim. "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default." Id. at 486-87. As to the failure to raise this objection on appeal, the Court also observed that "[t]his process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of noncompliance, is the hallmark of effective appellate advocacy. Smith v. Murray, 477 U.S. at 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)).

In addition, Petitioner did not raise this claim in the state post-conviction proceeding causing a procedural default of this claim. The Supreme Court emphasized that mere attorney error cannot be cause and cannot be attributable to the state.

> Attorney ignorance or inadvertence is not "cause" because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must "bear the risk of attorney error." ... Attorney error that constitutes ineffective assistance of counsel is cause, however ... as Carrier explains, "if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the state." [quoting Carrier, 477 U.S. at 488]. In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i.e., "imputed to the state."

Coleman v. Thompson, 501 U.S. 722, 753-54 (1991) (emphasis added).

Thus, Petitioner's claims about his appellate counsel cannot be granted for habeas relief, as Petitioner has not established cause or prejudice for his procedural default on this claim.

### 2. Prosecutor's Closing Argument

In reciting this claim on state law grounds on direct appeal, the Tennessee appellate court reasoned as follows:

In the case of an improper argument, this court must determine "whether the improper conduct 'affected the verdict to the prejudice of the defendant.' " Middlebrooks, 995 S.W.2d at 559 (quoting Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965)). To make this determination, we consider:

> (1) the challenged conduct in light of the facts and circumstances of the case;
>
> (2) the trial court and prosecution's curative measures;
>
> (3) the prosecutor's intent in making the argument;
>
> (4) the cumulative effect of the conduct in conjunction with any other errors in the record; and
>
> (5) the case's relative strength and weakness.

State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994).

State v. Dickerson, 2001 WL 1042128, at *3.

Petitioner cites the State's improper argument in the closing argument when the prosecutor argued:

> Ladies and gentlemen, aren't you tired of all this? Aren't you tired of opening your newspaper, hearing on the radio and seeing on tv where criminal defendants bring in expert witnesses to try and relieve them of responsibility of their own actions.

Id. at *2. The trial judge admonished the prosecutor during a bench conference, but did not instruct the jury to disregard the argument or that jurors had to consider Dr. McCoy's opinion. The Court agrees that the prosecutor's argument about mass-media cases was improper argument.

As to whether the prosecutor's improper remarks and closing argument violated Petitioner's rights under the Fourteenth Amendment's Due Process Clause, the federal standards are as follows:

> The misconduct must be so fundamentally unfair as to deny him due process, based on the totality of the circumstances of the case, taking into account the

15

degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

Kincade v. Sparkman, 175 F.3d 444, 446 (6th Cir. 1999); accord Girts v. Yanai, 501 F.3d 743, 755-56 (6th Cir. 2007).

In deciding Petitioner's claim, the state appellate court found as follows:

> In the case sub judice, the prosecutor's improper statements were directed at the findings of the defense expert regarding the defendant's ability to premeditate the murder. The prosecutor's improper remarks were brief due to the prompt objection by defense counsel and the trial court's immediate instruction to the prosecutor. Following this direction, no further improper argument was made. Further, it is highly doubtful that the brief comments made by the prosecutor had any impact upon the jury where the proof established that the defendant hid in the bushes with a weapon for an hour waiting for his wife to return. For these reasons, we conclude the improper argument did not affect the jury's verdict to the prejudice of the defendant and, thus, did not constitute reversible error.

Id. at *3. Given the extensive evidence against Petitioner, the expert proof at his trial and the brevity of the prosecutor's improper comments, the state courts could reasonably conclude that this comment did not result in fundamental unfairness to the Petitioner as the state standards are similar to the federal standards.

For these collective reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

ENTERED this the 20th day of January, 2011.

WILLIAM J. HAYNES, JR.
United States District Court